## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**SUNJOY INDUSTRIES GROUP, LTD.**
**(d/b/a "Sunjoy"),**

               **Plaintiff,**                     **Civil Action 2:22-cv-1896**

               **v.**                            **Magistrate Judge Chelsey M. Vascura**

**PERMASTEEL, INC.**
**(d/b/a "Permasteel"),**

               **Defendant.**

## OPINION & ORDER

This case arises from an intellectual property dispute between two business competitors in the patio-products industry. Plaintiff, Sunjoy Industries Group, Ltd. ("Sunjoy"), brings this action against Permasteel, Inc. ("Permasteel") for trade dress infringement and misappropriation of trade secrets under federal and state laws. This matter is before the Court for consideration of Permasteel's Motion to Dismiss (ECF No. 12). For the following reasons, Permasteel's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

The following facts are alleged in Sunjoy's Complaint or found in the attachments thereto, which, for purposes of this Motion, the Court accepts as true:

Sunjoy and Permasteel both sell patio furniture and accessories, including patio coolers. In 2016, Sunjoy designed and engineered an original cooler, known as the "Mason Cooler," that combined a rectangular shape with a specific simulated woodgrain finish and other elements.

Sunjoy provided a proprietary rendering of the Mason Cooler to a Chinese cooler factory, Panjiva Wuyi Beyond Tools Company ("Panjiva"). Panjiva manufactured the Mason Cooler from Fall 2017 through Fall 2019. Big Lots has sold the Mason Cooler exclusively since the first quarter of 2018 and featured the product in catalogs since at least 2020. (Compl., ECF No. 1, at ¶¶ 1–2, 9–15).

In 2019, Sunjoy designed and engineered another original cooler, called the "Lindmere Cooler," that combined an oval shape with a specific simulated woodgrain finish and other elements. In late Summer 2020, in the process of seeking competitive bids for the new product, Sunjoy provided a proprietary rendering of the Lindmere Cooler to Panjiva and one other Chinese factory. Sunjoy did not select Panjiva for the job. Instead, Sunjoy contracted with the other factory to manufacture the Lindmere Cooler, starting in Fall 2020, and to take over manufacturing of the Mason Cooler for the 2021 sales year. Big Lots has sold the Lindmere Cooler exclusively since the first quarter of 2021 and included the product in catalogs since. (*Id.* at ¶¶ 15–27).

In the second quarter of 2021, Sunjoy discovered that Permasteel was selling coolers through multiple online vendors that appeared to be "knock-offs" (with substantially-similar features of Sunjoy's designs) of the Mason and Lindmere coolers. Permasteel's coolers were manufactured by Panjiva, and based on the short amount of time between Sunjoy's creation of the Lindmere Cooler and Permasteel's offer for sale of its substantially-similar item, Sunjoy surmised that Panjiva must have improperly used Sunjoy's design renderings to create Permasteel's coolers. On June 4, 2021, Sunjoy sent a cease-and-desist letter to Permasteel, demanding cessation of Permasteel's sales of the identified products. Permasteel responded by

2

temporarily ceasing all online sales of these products, but then resumed sales in the first quarter of 2022. (*Id.* at ¶¶ 29–42).

Subsequently, on April 6, 2022, Sunjoy filed this six-count action. Sunjoy alleges that Permasteel violated Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by infringing Sunjoy's trade dress rights and, further, that Permasteel violated the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, *et seq.*) (DTSA) and Ohio's Uniform Trade Secrets Act (Ohio Rev. Code § 1333.61, *et seq.*) (OUTSA) by misappropriating Sunjoy's trade secrets. On October 12, 2022, Permasteel filed the subject Motion to Dismiss all claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.     STANDARDS

In evaluating the sufficiency of a complaint under Rule 12(b)(6), a court must construe it in the light most favorable to the plaintiff and determine whether the factual allegations present any plausible claim. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claimant's task at this point is to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," not "detailed" factual allegations. Fed. R. Civ. P. 8(a)(1). Though this plausibility standard does not require showing that success on the merits is probable, it requires more than the "sheer possibility" of relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true.").

To survive such a motion to dismiss, the "complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under *some* viable

legal theory." *Id.* at 562. Although this pleading standard is liberal, and a court must accept as true all factual allegations in the complaint, the court need not accept as true any unwarranted factual inference or legal conclusion alleged therein, even if couched as a factual allegation. *Iqbal*, 556 U.S. at 678; *see also JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581–82 (6th Cir. 2007). The claimant must have put forth "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the requisite elements of the claim]." *Twombly*, 550 U.S. at 556. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do . . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") *Iqbal*, 556 U.S. at 678 (citing *Twombly*).

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In conducting this analysis, the Court may consider the pleadings, exhibits attached thereto, and documents referred to in the complaint that are central to the plaintiff's claims and attached by the defendant to the motion to dismiss. *See Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001); *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999).

### III.    ANALYSIS

**A.    Trade Dress Infringement Claims (Counts I and II)**

Section 43(a) of the Lanham Act protects unregistered trade dress and creates a civil cause of action for trade dress infringement. 15 U.S.C. § 1125(a); *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000); *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 503 (6th Cir. 2013). As explained by the United States Court of Appeals for the Sixth Circuit:

> "Trade dress" refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sales. Trade dress involves the total image of a product and may include features such as size, shape, color, or color combinations, texture, graphics, or even particular sales techniques.

*Leapers, Inc. v. SMTS, LLC*, 879 F.3d 731, 735 (6th Cir. 2018) (citing *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002)). Trade dress "is generally classified into the categories of either 'product design' (also known as 'product configuration') or 'product packaging,' and occasionally a [third catchall]." *Groeneveld*, 730 F.3d at 503 (quoting *Samara Bros.*, 529 U.S. at 215).

At issue here are Sunjoy's claims of ownership to the "distinctive trade dress embodied by" the design and configuration of the Mason and Lindmere coolers, and Permasteel's alleged improper use of this distinctive trade dress to produce goods that cause marketplace confusion in violation of the Lanham Act. (Compl., Counts I, II). To state a claim for trade dress infringement under the Act, "a plaintiff must prove that its allegedly infringed product design (1) is nonfunctional, (2) has acquired secondary meaning, and (3) is confusingly similar to the allegedly infringing product design." *Groeneveld*, 730 F.3d at 503 (citing *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006)). Non-functionality and secondary meaning are "required to show protectability—that is, that the plaintiff's trade dress is capable of Lanham Act protection in the first place" whereas confusing similarity (also called "likelihood of confusion") is "required to show that the trade dress has in fact been infringed by the defendant." *Id.* at 504 (citing *Abercrombie & Fitch*, 280 F.3d at 629). Permasteel moves to dismiss both counts of trade dress infringement, arguing that Sunjoy fails to plead sufficient facts to establish

5

any of these three elements and therefore has no actionable claim to relief. (Mem. in Support, ECF No. 12, at PAGEID 56–60).

### 1. Non-functionality

A plaintiff cannot claim trade dress protection for product features that are functional. *Fuji Kogyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 683 (6th Cir. 2006) (citing *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)). Generally, a product design feature is considered functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article[—]where, without its use, competitors [are] at a significant non-reputation-related disadvantage." *Id.* at 684–85 (internal quotations omitted). Design elements evidencing aesthetic intent and purpose tend to show that the design is "purely ornamental, incidental, or arbitrary" and therefore non-functional. *Leapers, Inc.*, 879 F.3d at 736. However, sometimes products function based on their aesthetic properties and therefore have "aesthetic functionality"—where the design is "so fundamental to an industry" that it "communicates the use, purpose, cost, or quality of the product in a way that competitors cannot avoid replicating without incurring costs not to copy but to design around." *Id.* at 737 (internal citations omitted).

Additionally, the Sixth Circuit recognizes that even when individual elements of a design are functional, the overall design combination may still deserve trade dress protection. *Antioch Co. v. Western Trimming Corp.*, 347 F.3d 150, 157–58 (6th Cir. 2003). To receive trade dress protection for an overall combination of functional features, however, a plaintiff must be able to show that those features are "configured in an arbitrary, fanciful, or distinctive way." *Id.* at 158 (citing *TrafFix Devices*, 532 U.S. at 32). Thus, if "engineering necessity influence[s] the [specific] configuration of the functional components," then the overall product design is considered functional. *Id.*

Here, Permasteel argues that Sunjoy "did not plead *any* facts" establishing non-functionality. (Mem. in Support, ECF No. 12, at PAGEID 59). It is true, and Sunjoy even admits, that the Complaint never explicitly uses the term "non-functional" when describing its trade dress elements. (Mem. in Opp'n, ECF No. 18, at PAGEID 77). The Court disagrees, however, that this failure is automatically fatal to Sunjoy's pleading of the element of non-functionality. If a plaintiff cannot automatically survive a motion to dismiss by merely asserting in the complaint, in conclusory fashion, that the trade dress is "non-functional," without presenting any factual undergirding, then the adverse is also true. A defendant should not automatically win a motion to dismiss where the complaint fails to directly use the term "non-functionality" but otherwise includes factual allegations sufficient to infer non-functionality. *See, e.g., Galloway v. Chesapeake Union Exempted Vill. Sch. Bd. of Educ.*, No. 1:11-cv-850, 2012 WL 5268946, at *11 (S.D. Ohio Oct. 23, 2012) (finding that plaintiffs' failure to use the specific "buzz words" of "malicious purpose, in bad faith, or in a wanton or reckless manner" when describing defendants' conduct, as required to plead an element of the claim, did not warrant dismissal where plaintiffs provided sufficient facts from which to conclude that the conduct fell within the standard).

The Complaint here may not directly state that the trade dress is "non-functional," but it presents enough factual allegations relating to the essential element of non-functionality for the Court to infer that Sunjoy plausibly plead the element at this stage. *See Iqbal*, 556 U.S. at 679. Sunjoy provides a list description of the design elements claimed as protected and also includes visual representations of each cooler that represent the elements described. From these, the Court can determine that, though some of the design features individually have an obvious functional nature that would not be protectable alone (e.g. retaining rail, legs, hinges, handles, bottle cap

opener), other features such as the respective shapes of the coolers and the surface of simulated woodgrain-finished panels arranged in a specific pattern, as well as the overall composition of the coolers, including the specific placement of the individual features, are plausibly non-functional and protectable trade dress. *Antioch*, 347 F.3d at 157–58; *see Lanard Toys*, 468 F.3d at 417 (assessing functionality question based on the "plain appearance" of the product design's exterior); *Good L Corp. v. Fasteners for Retail, Inc.*, No. 3:18-cv-00489, 2019 WL 1429252, at *3 (M.D. Tenn. Mar. 28, 2019) ("[T]he plain appearance of the product from the photos in the Amended Complaint shows the trade dress is at least arguably non-functional.") (citing *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 417 (6th Cir. 2006)); *cf. Collection v. Latham Cos.*, No. 5:20-CV-217-CHB, 2021 WL 5413796, at *8 (E.D. Ky. Mar. 16, 2021) (dismissing trade dress claim where plaintiff failed to allege non-functionality and finding images of alleged trade dress insufficient to save the claim because court could not "distill from the images what the plaintiff claim[ed] as protected trade dress or identify what [was] non-functional about its product design").

Further, the Court finds Permasteel's reliance on *Abercrombie & Fitch* misplaced. (Reply Br., ECF No. 22 at PAGEID 96–97). Significantly, Permasteel severely understates the trade dress at issue in that case, failing to mention Abercrombie's broad claim to specific words, phrases, and logos combined with colors, fabrics, and patterns common to the clothing industry. 280 F.3d at 625, 643–44. The argument that Sunjoy's woodgrain finish is aesthetically functional, similar to Abercrombie's clothing colors and designs, is inapposite at this juncture as there is a plausible distinction between the clothing industry and the patio goods industry. *See Leapers*, 879 F.3d at 737–38 (distinguishing *Abercrombie*, where "aesthetic tastes drove the market for [] clothing," from the ornamental design of the rifle scope at issue). And to the extent

there is a factual dispute regarding non-functionality, it should not be resolved at the pleading stage. *See Good L Corp.*, 2019 WL 1429252, at *3 ("Plaintiff does not have to rebut the presumption identified by Defendant (that features are deemed functional until proven otherwise) at this stage of the case.") (internal citations omitted); *Thomas & Betts Int'l LLC v. Burndy LLC*, No. 2:14-cv-02296-JPM-tmp, 2015 WL 5944387, at *4 (W.D. Tenn. Oct. 13, 2015) (finding that plaintiff's design was "identifiable in the illustrations in the Complaint, [permitting] the Court to discern the distinctive, asserted non-functional, aspects of [the] trade dress," and holding that any possible contradictions identified by defendant in attachments "may present a factual dispute regarding non-functionality, [which] question should not be resolved at the pleading stage").

Accordingly, the Court finds that Sunjoy has plausibly plead the element of non-functionality such that Permasteel is not entitled to a dismissal of Counts I and II on this basis.

### 2. Secondary Meaning and Likelihood of Confusion (Confusing Similarity)

Permasteel further moves for dismissal on the grounds that the Complaint is devoid of facts to support the elements of secondary meaning or likelihood of confusion.

Generally, "in the absence of a patent or copyright, one manufacturer can copy the designs of another[; thus to] acquire protectable trade-dress rights in one's design, one must show that the design has acquired a 'secondary meaning' that 'serves to identify the product with its manufacturer or source.'" *Premium Balloon Access., Inc. v. Creative Balloons Mfg.*, 573 F. App'x 547, 555 (6th Cir. 2014) (quoting *TrafFix Devices*, 532 U.S. at 29). Consumers simply "are not predisposed to treat design features[, even the most unusual ones,] as an indication of source." *Id.* (internal citations omitted). A plaintiff ultimately must be able to show that, "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Leapers*, 879 F.3d at 740. Stated another way, to have

acquired secondary meaning, an article of merchandise must "proclaim" its source identification "in the minds of the buying public" so that a prospective customer affirmatively thinks "That is the article I want because I know its source." *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 311 (6th Cir. 2001) (internal citations omitted).

The Sixth Circuit often applies a seven-factor test to determine whether secondary meaning exists in a trade dress, with no single factor determinative and not every factor needing addressed: "(1) direct consumer testimony, (2) consumer surveys, (3) exclusivity, length, and manner of use, (4) amount and manner of advertising, (5) amount of sales and number of customers, (6) established place in the market, and (7) proof of intentional copying." *Leapers*, 879 F.3d at 740–41. The Sixth Circuit recognizes, however, that this factor test has limitations when applied to product design cases because "product design almost invariably serves purposes other than source identification[,]" and many of the factors "may give no indication" whether the public actually associates the product's image with its specific source. *Premium Balloon*, 573 F. App'x at 555–556.

Like the secondary meaning element, the Sixth Circuit generally applies a multi-factor test to the consideration of whether the competing products present a sufficient likelihood of confusion, again with no single factor determinative and not every factor needing addressed: "(1) strength of the plaintiff's [trade dress]; (2) relatedness of the goods; (3) similarity of the [trade dresses]; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the [trade dress]; [and] (8) likelihood of expansion of the product lines." *Groeneveld*, 730 F.3d at 509 (quoting *Frisch's Rest., Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)). These factors go to the heart of the likelihood-of-confusion inquiry: "whether an ordinary consumer would confuse the products at

issue, which in fact come from different sources, as emanating from a single source or from associated sources." *Id.* at 504. And "[t]he appropriate benchmark for assessing the likelihood of confusion is the ordinary consumer who would consider buying the product at issue." *Id.* at 509. Thus, the likelihood-of-confusion element of trademark law (and therefore trade dress law) is "designed to promote informational integrity in the marketplace [by] ensuring that consumers are not confused about what they are buying" and what brand they are buying from. *Id.* at 512. It is not designed to prevent "copying per se" but deception or confusion as to product source. *See id.* at 513–14.

The Court agrees with Sunjoy that, at this stage, it is not required to provide enough facts to *prove* each element. But Sunjoy must at least set forth facts showing the elements of trade dress infringement are plausible. Thus, the remaining questions before the Court are whether Sunjoy has alleged enough facts from which the Court can reasonably infer the plausibility (not just possibility) that the consuming public (1) identifies Sunjoy as the source of the Mason and Lindmere coolers, based on the product design trade dress, and (2) would be confused into thinking that Permasteel's products emanate from Sunjoy (either directly or through association) because of the similarity to the Mason and Lindmere coolers.

Sunjoy's Complaint clearly and repeatedly alleges that Permasteel created "knock-offs" of (thus intentionally copied) the Mason and Lindmere coolers, which is factually enhanced by the undisputed allegations of Permasteel being a market competitor, who used the same manufacturer, and by the photographic comparisons, attached as exhibits to the Complaint, that show an obvious close similarity between the parties' products. (*See* Compl., ¶¶ 13, 29–42, Exs. A–H). Beyond this, however, Sunjoy provides scant factual enhancement for its claims of secondary meaning and likelihood of confusion. Sunjoy makes the naked assertion, devoid of

11

factual enhancement, that the coolers have distinctive elements "that consumers associate with Sunjoy as the source." (Compl., ¶¶ 11, 17). Significantly, Sunjoy raises no facts to show any connection between its brand and the publicly-marketed Mason and Lindmere coolers. The Court finds it highly relevant that within the few years alleged for the market presence of the Mason and Lindmere coolers (since 2018 and 2021 respectively), the coolers have been offered exclusively to the public through a single retailer (Big Lots) and only as part of Broyhill-branded marketing. (Compl., ¶¶ 12–15, 18, 26–27, B–C, F). In fact, Sunjoy's own evidence shows that the initial offer sheet for the Mason Cooler was titled the "Broyhill" cooler, and both coolers can be seen in the catalog listings repeatedly alongside Broyhill patio collections, and even at times bearing a "Broyhill" nameplate. (*Id.*). Sunjoy's name is nowhere to be found in the alleged market listings or photographs.

Additionally, Sunjoy has raised no allegations in the Complaint of actual customer confusion or of any other public identification or recognition of Sunjoy being the known source of the Mason and Lindmere coolers. Further, Sunjoy raises no allegations in the Complaint of any intent by Permasteel to deceive the consuming public into believing they were purchasing Sunjoy brand-related products. The visual representations of the marketed items, presented by Sunjoy, clearly show Permasteel's name on the market listings with the Permasteel brand logo prominently attached to the front of the products. (Compl., Ex. H).

Bearing these allegations (or lack thereof) in mind, and turning to the element of secondary meaning, the Court finds that Sunjoy's allegations, though thin, are not threadbare. Sunjoy has raised sufficient facts as to intentional copying. Though it is hard for the Court to reasonably infer that solely Broyhill-marketed items could "proclaim" to the buying public that Sunjoy is the source, the Court must follow the Sixth Circuit's holdings that factual indicia of

precise, intentional copying can serve to show secondary meaning "because there is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence." *See Abercrombie*, 280 F. 3d at 639 (internal citations omitted). Additionally, the Court recognizes that the factor of consumer surveys may not be readily available at this stage of the case. Thus, reading the Complaint in the light most favorable to Sunjoy, the Court finds Counts I and II cannot be dismissed on the basis of secondary meaning.

However, the Court finds there is no facially plausible case for the element of likelihood of confusion because Sunjoy has not raised a right to relief above the speculative level. Though allegations of intentional copying, which Sunjoy primarily relies on, may alone weigh in the secondary meaning analysis, such allegations have "no bearing on the likelihood-of-confusion issue." *Groeveveld*, 730 F.3d at 514. The "appropriate 'intent' to focus on is not the intent to *copy* but rather the intent to *deceive* or *confuse*." *Id.* (emphasis in original). The Complaint contains no such allegations.

Nor does the Court find that Sunjoy raises any other allegations from which to infer a plausible claim that the consuming public is likely confused into believing Permasteel's products, which are clearly marketed and branded as "Permasteel," are connected to Sunjoy based on the similarity to the "Broyhill"-marketed and branded Mason and Lindmere coolers. *See id.* at 510, 514–15 (finding that competitors' products, though they looked "essentially the same," could not reasonably lead consumers to think they belonged to the same company in light of such "stark visual differences in branding" with a "starkly different logo that it prominently displays on [the products] and all its sales and marketing literature"). Because no amount of discovery would reasonably be expected to change these alleged facts, the Court must find that there is no actionable confusion created. If anything, Sunjoy raises a plausible likelihood of

confusion of its own making—that the consuming public believes the Mason and Lindmere coolers originate from Broyhill.

In sum, though the Court finds sufficient facts presented to raise a plausible case of non-functionality and secondary meaning, the Court cannot find likelihood of confusion plausible. On this basis, the Court finds that Sunjoy fails to state a claim against Permasteel for trade dress infringement and therefore grants its Motion to Dismiss as to Counts I and II.

**B.      Misappropriation of Trade Secrets Claims (Counts III through VI)**

Sunjoy's remaining claims are for misappropriation of trade secrets under OUTSA and DTSA. Specifically, Sunjoy posits that "confidential renderings" of the Mason and Lindmere cooler designs were maintained as protectable trade secrets and "intentionally misappropriated" by Permasteel through Panjiva. (Compl., ¶¶ 52–53, 56–57, 60–61, 64). Permasteel moves for dismissal on all counts, asserting that Sunjoy failed to plead a protectable trade secret. (Mem. in Support, ECF No. 12, at PAGEID 62–63).

Courts consider these state and federal law claims together because the definition and requirements of the OUTSA and DTSA are essentially the same. *Mech. Constr. Mgrs., LLC v. Paschka*, No. 3:21-cv-302, 2022 WL 1591605, at \*9 (S.D. Ohio May 19, 2022); *see also* H.R. REP. 114-529 ("While other minor differences between the UTSA and Federal definition of a trade secret remain, the Committee does not intend for the definition of a trade secret to be meaningfully different from the scope of that definition as understood by courts in States that have adopted the UTSA."). To state a claim under each, Sunjoy must present facial plausibility of (1) the existence of a trade secret and (2) misappropriation of the trade secret, as defined by statute.[1]

---

[1] Both parties cite to *Heartland Home Fin., Inc. v. Allied Home Mortg. Cap. Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008), for the elements of a misappropriation-of-trade-secrets claim under Ohio law. However, the Sixth Circuit

The OUTSA defines "trade secret" as:

[I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). The DTSA provides a similar definition. *See* 18 U.S.C. § 1839(3). The Ohio Supreme Court employs a six-factor test when determining whether information constitutes a trade secret:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Besser*, 89 Ohio St. 3d at 399–400 (internal citations omitted). Courts have often stated that determining whether information constitutes a trade secret is a "highly fact-specific inquiry" that may be inappropriate at the pleadings stage. *See Novus Grp., LLC v. Prudential Fin., Inc.*, No. 2:19-cv-208, 2019 WL 4452708, at *4 (S.D. Ohio Sep. 17, 2019) (citations omitted); *Gerling &*

---

recognizes that *Heartland* was superseded by statute, with the "unauthorized use of a trade secret" as only one means of showing misappropriation. *Kendall Holdings, Ltd. v. Eden Cryogenics,* 521 F. App'x, 453, 457 n. 6 (6th Cir. 2013); *see* Restatement (Third) of Unfair Competition § 40 cmt. b (1995) (explaining that UTSA imposes liability not just for the wrongful use or disclosure of a trade secret, as case law often recites, but also for its acquisition by improper means); *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 401 (Ohio 2000) (noting that broader definition of "trade secret" in OUTSA "extends protection to a plaintiff who has not yet had an opportunity or acquired the means to put a trade secret to use") (citation omitted).

*Assocs.. v. Odulair, LLC*, No. 2:16-cv-1000, 2017 WL 2790669, at *6 (S.D. Ohio June 28, 2017); *Noco Co. v. CTEK, Inc.*, No. 1:19 CV 00853, 2020 WL 821485, at *8 (N.D. Ohio Feb. 18, 2020) ("[W]hether measures taken to keep information secret are reasonable under the circumstances cannot be decided at the pleading stage.") (citation omitted).

The OUTSA defines "misappropriation" as meaning any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;
(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
(a) Used improper means to acquire knowledge of the trade secret;
(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B). "Improper means" includes "breach or inducement of a breach of a duty to maintain secrecy." *Id.* at (A). The DTSA similarly defines misappropriation as requiring the acquisition or disclosure of an improperly-acquired trade secret. *See* 18 U.S.C. § 1839(5).

As an initial matter, it is undisputed as a matter of law that information disclosed by a marketed product cannot be secret. *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 643 (6th Cir. 2020) ("Matters of public knowledge or general knowledge in the industry or ideas which are well known or easily ascertainable, cannot be trade secrets. Similarly, matters disclosed by a marketed product cannot be secret.") (internal quotation omitted); *see also State ex rel. Rea v. Ohio Dep't of Educ.*, 81 Ohio St.3d 527, 532 (1998) ("Once material is publicly disclosed, it

16

loses any status it ever had as a trade secret."); Restatement (Third) of Unfair Competition § 39 cmt. f (1995) ("[I]nformation readily ascertainable from an examination of a product . . . is not a trade secret."). Therefore, once Sunjoy voluntarily released the Mason Cooler into the market in 2018 and, likewise, voluntarily released the Lindmere Cooler into the market in the first quarter of 2021, any alleged trade secret in their designs became readily ascertainable by the public and could no longer be legally protected. *See BDT Prods. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 755 (6th Cir. 2010).

Thus, the only possible remaining question is whether there is a plausible claim of misappropriation of a trade secret existing for the design of the Lindmere Cooler prior to its release to market. Sunjoy has made the following relevant allegations in its Complaint:

- Sunjoy had a contractual relationship with Panjiva to manufacture the Mason Cooler from Fall 2017 to Fall 2019.

- Sunjoy "incurr[ed] considerable expense to create the original designs for the Lindmere Cooler."

- In seeking competitive bids for the Lindmere's production, Sunjoy provided a "confidential rendering" to Panjiva and one other factory in late Summer 2020.

- The design rendering bore a "proprietary" ledger alongside Sunjoy's brand stamp, and showed a bottle opener and catch tray.

- Throughout "development and manufacturing" of its coolers, Sunjoy "maintained the designs . . . as confidential trade secrets."

- The Lindmere was manufactured without a bottle opener and catch tray, as requested by Big Lots.

17

- Sunjoy began selling the Lindmere the first quarter of 2021, and Permasteel started selling "a knock-off version of the Lindmere Cooler" the second quarter of 2021 that included a bottle opener and catch tray, as included in Sunjoy's original rendering.

- "Upon information and belief," Panjiva manufactured Permasteel's "knock-off" based on the "confidential information" Panjiva had received from Sunjoy during bidding; Permasteel "knew of Panjiva's improper use of Sunjoy's confidential information;" and based on the short turn-around time between Sunjoy's creation of the Lindmere and Permasteel's first sale of its "knock-off," "Permasteel must have used Sunjoy's confidential information."

(Compl., at ¶¶ 13, 16, 19–24, 27–28, 31–38, Ex. D).

The Court finds that these facts allege enough to make a plausible showing of the existence of a trade secret. The Lindmere design clearly falls with the type of information sought to be protected by statue as a trade secret, being a design with economic value to Sunjoy (as it was costly to design) and economic value in not being known to an industry competitor who could benefit from it through obvious savings in original design costs or reverse engineering. The Court finds that though Sunjoy provides few facts to further exemplify its conclusory allegation that it "maintained" the design "as a trade secret," Sunjoy did allege that it included a confidential/proprietary stamp on the rendering, while seeking a bid from a company it had previously contracted with, and had only provided the rendering to one other company, which then produced the product. The question of whether the confidential/proprietary stamp was enough effort to reasonably maintain secrecy raises a fact determination for a later stage.

18

As to the misappropriation prong of the inquiry, Permasteel readily admits knowledge of Panjiva's unsuccessful bid for Sunjoy's work, and that Panjiva "approached and offered to produce certain patio coolers for Permasteel, [which] Permasteel began purchasing and selling." (ECF No. 12, at PAGEID 56). Further, due to the alleged timing of Permasteel's sales, and the fact that the Lindmere "knock-off" included the bottle opener and catch tray elements, which were included in the confidential/proprietary rendering but not on the marketed Lindmere, it is obvious that Permasteel benefitted from the original design rendering. Under the circumstances of prior business dealings between Sunjoy and Panjiva, and the confidential/proprietary markings on the renderings provided during the bid process, Panjiva had a plausible duty (if only implied, since no contractual duty was alleged) to maintain the secrecy of the designs. *See Gerling*, 2017 WL 2790669, at *5) (recognizing that the statute "does not require a specific contractual promise" not to use or divulge the confidential information and finding allegations supported plausible misappropriation for an "implied obligation" of secrecy where the drawings were labeled as "proprietary" and part of "contract talks" for a potential business relationship).

In sum, the Court finds that Sunjoy's OUTSA and DTSA claims as to the Mason Cooler (Counts III and V) must be dismissed for failure to state a claim, in their entirety, because Sunjoy has been selling the product since 2018, well before the time of the alleged misappropriation. Likewise, Sunjoy's OUTSA and DTSA claims as to the Lindmere Cooler (Counts IV and VI) must be limited to any alleged damages resulting from misappropriation between the time Panjiva received Sunjoy's design rendering in late summer 2020 and when Sunjoy started selling the Lindmere in the first quarter of 2021. Any claims to misappropriation after the first quarter of 2021 fail as a matter of law.

**C.**     **Request for Amended Complaint**

In the conclusion to its memorandum in opposition, Sunjoy closes by stating: "Should the Court find any cause of action to be deficient, Sunjoy respectfully requests that the Court permit Sunjoy to file an amended complaint under Fed. R. Civ. P. 15(a)(2)[.]" (ECF No. 18, at PAGEID 84). The Sixth Circuit routinely rejects such a cursory, contingent statement, finding this does not constitute a proper motion for leave to amend. *See, e.g.*, *La. Sch. Empls.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010) ("A request for leave to amend 'almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend.'") (quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000)); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004) ("[A] bare request in [a response] to a motion to dismiss—without any indication of the particular grounds on which amendment is sought, *cf.* Federal Rule of Civil Procedure 7(b)—does not constitute a motion within the contemplation of Rule 15(a)."); *Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.*, No. 2:12-cv-4, 2012 WL 12942602, at *1 (S.D. Ohio Aug. 13, 2012) (emphasizing courts' routine rejection of throwaway requests for amendment related to motions to dismiss) (collecting cases).

Sunjoy never filed a motion for leave to amend, attached a proposed amended complaint to a motion (or even its brief in opposition to the current motion), or otherwise presented grounds for amendment to the Court. Rather, Sunjoy inappropriately seeks to procure an advisory opinion from this Court on any highlighted deficiencies Sunjoy can then cure through an amended complaint, which is not within the contemplation of Rule 15(a). *See Alexander v. Eagle Mfg. Co., LLC*, 714 F. App'x 504, 511 (6th Cir. 2017) (finding plaintiff had the "responsibility to provide details concerning the proposed amendments" to his complaint and

20

that he was "not entitled to an advisory opinion from the district court informing him of the deficiencies in his complaint and allowing him an opportunity to cure"); *PR Diamonds*, 364 F.3d at 699. Had Sunjoy properly filed a motion to amend the Complaint—prior to the Court's consideration of the Motion to Dismiss—and accompanied that motion with a memorandum identifying the proposed amendments, the Court would have considered the Motion to Dismiss in light of the proposed amendments to the Complaint. But Sunjoy did not, so Permasteel is entitled to a review of the Complaint as filed pursuant to Rule 12(b)(6). *See Begala*, 214 F.3d at 784. Therefore, the Court denies Sunjoy's cursory, contingent request.

## IV.    DISPOSITION

For the foregoing reasons, Permasteel's Motion to Dismiss (ECF No. 12) is **GRANTED IN PART and DENIED IN PART**. Specifically, the Court dismisses Counts I, II, III, and V in their entirety, and Sunjoy may proceed with Counts IV and VI, but as limited in scope as described herein.

**IT IS SO ORDERED**.

/s/ Chelsey M. Vascura
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE